IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,

    Plaintiff,

v.                                           Case No. 13-20033-07-KHV

JORGE DELGADO-OVALLE,

    Defendant.

MEMORANDUM AND ORDER

The court has before it defendant Jorge Delgado-Ovalle's Motion to Dismiss Indictment (Dkt. 139). After holding a hearing on the motion and reviewing the parties' briefs, the court is prepared to rule.

**I. Background**

This case arises from the employment of undocumented persons by Advantage Framing Systems, Inc., a company in Spring Hill, Kansas.[1] The court summarizes the relevant facts alleged by the government. Advantage provided local builders and contractors with engineered floor, pre-built wall panel, and roof truss systems, as well as onsite framing erection labor. Defendants James Humbert, Kimberly Humbert, and Charles Stevens II were all owners of Advantage at all times relevant to this case.[2]

From 2005 until February 2013, the owners of Advantage agreed with the other defendants to form a conspiracy to employ undocumented persons not lawfully present

---

[1] "Undocumented persons" refers to people who present are or were in the United States unlawfully.
[2] The Humberts and Stevens have all pleaded guilty to count one of the indictment, and the government has dropped the remaining counts against them as part of their plea agreements. *See* Dkts. 130, 134, & 138.

in the United States. Hiring undocumented workers allowed Advantage to lower its operating costs by avoiding paying its share of Social Security, workers' compensation, and unemployment insurance contributions. These savings, presumably, gave Advantage a very literal advantage over competitors, allowing it to place lower bids on contracts.

The remaining defendants, including Ovalle, are undocumented persons who allegedly conspired with the owners of Advantage to hire other undocumented workers. Advantage required its framing crew leaders, like Ovalle, to show proof of liability insurance coverage. After seeing proof of insurance, Kim Humbert would issue a check to the crew leader, who would pay the other undocumented workers in his crew—usually five or six other workers. Advantage's bank accounts—maintained by the Humberts and Stevens—revealed that checks were issued to more than thirty-two crews for their framing work. Defendants Jose Ramon Caro-Corral, Jorge Uriel Delgado-Ovalle, Angel Arguello-Plata, and Dennis Ericson Portillo served as crew leaders responsible for cashing Advantage checks and paying their crews—which they knew were made up of persons unlawfully present in the United States.[3] Specifically, between April 4, 2011 and December 17, 2012, Advantage issued approximately $419,688.95 in checks to Ovalle.

Advantage required Ovalle and other crew leaders to attend safety training meetings at its main business location in Spring Hill, Kansas. At one of these meetings, workers were told that if investigators from Occupational Safety and Health

---

[3] Angel Arguello-Plata and Dennis Ericson Portillo have both entered into plea agreements in this case.

2

Administration (OSHA) conducted an on-site inspection, the workers should tell the investigators that they worked for a subcontractor rather than directly for Advantage. At one training meeting, the Humberts discussed how they practiced running a drill to plan for immigration officials showing up at the office. The Humberts remarked that the "white guys would have no clue what to do while everyone else ran and hid."

Additionally, the government alleges that the Humberts and Stevens knew that certain workers had provided fictitious names and addresses on their employment documents. While marketing Advantage, James Humbert told a potential investor that an individual was making fraudulent identification documents for Advantage's undocumented workers and that by the time the government realized his workers were using fake Social Security numbers, the workers were no longer employed by Advantage. The government alleges that Advantage issued checks to crew members who were known to be using fictitious names, including issuing checks to at least three different men using the alias "Jesus Gonzalez."

On March 15, 2013, a grand jury charged Ovalle and the other defendants with offenses relating to Advantage's scheme of hiring undocumented wokers. *See* Dkt. 1. Count one of the indictment charges all defendants with conspiracy under 18 U.S.C. § 371 to "harbor illegal aliens in the United States for commercial advantage and private financial gain, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iv) and (a)(2)(B)(ii)." Counts two through eleven allege that the defendants violated 8 U.S.C. § 1324(a)(1)(A)(iv), (v)(II), (a)(2)(B)(ii) and 18 U.S.C. § 2 by "intentionally encourage[ing] aliens . . . for the purpose of commercial advantage and private financial gain, to reside

3

in the United States, knowing and in reckless disregard of the fact that such residence was in violation of law." Each count identifies a separate undocumented person the defendants allegedly encouraged to reside in the United States. Count thirteen alleges the defendants conspired to launder money in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and § 1956(h), by conducting financial transactions with proceeds of harboring undocumented persons for commercial advantage and private financial gain, while knowing that the property involved in the financial transactions represented proceeds of unlawful activity. Counts fourteen through thirty-one allege that the defendants laundered money in violation of 18 U.S.C. § 1956(a)(1)(B)(i), by issuing checks involving the proceeds of harboring undocumented persons for commercial advantage and private financial gain, while knowing that the property involved in the financial transactions represented proceeds of unlawful activity.[4] The government also seeks forfeiture of any assets the defendants obtained through their crimes.

Ovalle moves to dismiss the indictment, arguing that none of the charges in the indictment allege a crime. The court held a hearing on the motion in Kansas City on November 5, 3013, where attorneys representing the government and Ovalle made oral arguments.

---

[4] Of counts fourteen through thirty-one, defendant Ovalle is only charged in counts twenty-eight and twenty-nine, for cashing checks of $4,499.00 and $12,310.80, respectively.

**II. Legal Standard**

"[R]ule 12 authorizes the district court to resolve before trial only those motions 'that the court can determine without a trial of the general issue.'" *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (quoting FED. R. CRIM. P. 12(b)(2)). In a criminal case, the general issue is defined as evidence relevant to the question of guilt or innocence. *Id.* (internal citation and quotation marks omitted). "Rule 12 permits pretrial resolution of a motion to dismiss the indictment only when 'trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" *Id.* (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)).

At this stage, an indictment is judged solely for the sufficiency of its charges without regard to the strengths and weaknesses of the government's case. *United States v. Ailsworth*, 873 F. Supp. 1450, 1460 (D. Kan. 1994) (citations omitted). Courts regard an indictment sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense. *United States v. Blechman*, 782 F. Supp. 2d 1238, 1244 (D. Kan. 2011) (internal citations and quotation marks omitted). A court is not to look behind the indictment to see if it is supported by substantial evidence. *Ailsworth*, 873 F. Supp. at 1460 (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)). "An indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *Id.* (quoting *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)). "On a motion to dismiss an indictment, the question is not whether the government has presented sufficient evidence to support the charge, but

solely whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offense." *United States v. Todd,* 446 F.3d 1062, 1067 (10th Cir. 2006) (internal citations omitted).

**III. Analysis**

The court starts by setting forth the specific charges in the indictment, as the word "harboring" has apparently led to some confusion. Next, the court addresses the charges alleging Ovalle "encouraged or induced" undocumented persons to reside in the United States with the knowledge that they were doing so unlawfully. Finally, the court addresses the sufficiency of the money laundering charges brought against Ovalle.

*A. Confusion with Word "Harboring" in the Indictment*

Count one of the indictment charges Ovalle and the other defendants with conspiring to "harbor illegal aliens . . . in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iv) and (a)(2)(B)(ii)." Counts two through twelve fall under the heading "Harboring Illegal Aliens," and they allege that Ovalle and the other defendants "intentionally encouraged aliens . . . to reside in the United States . . . . in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv), (v)(II), (a)(2)(B)(ii) and Title 18, United States Code, Section 2." The remaining money laundering counts refer to "harboring illegal aliens" as the underlying illegal activity from which proceeds were laundered. As the court explains, the use of the word "harboring" in the indictment is not entirely inappropriate, but it is misleading.

6

Section 1324, under which Ovalle and his co-defendants have been charged, is labeled "Bringing in and harboring certain aliens." *See* 8 U.S.C. § 1324 (2005). Technically then, any charge brought under § 1324 might arguably be considered a "harboring" charge. However, § 1324(a)(1)(A) prohibits other activities in addition to harboring, as are set out in its subsections: (i) bringing an undocumented person into the United States at a place other than a designated port of entry; (ii) transporting undocumented persons within the United States; (iii) concealing, harboring, or shielding undocumented persons from detection in the United States; (iv) encouraging or inducing an undocumented person to come to, enter, or reside in the United States; and (v) conspiring to commit—or aiding the commission of—these preceding acts. The charges in the indictment are all anchored in § 1324(a)(1)(A)(iv), the "encouraging or inducing" subsection.[5] Using the word "harboring" to describe these charges is

---

[5]The government also charged Ovalle with aiding or abetting others in violating § 1324(a)(1)(A)(iv), pursuant to subsection (v)(II).

Additionally, the indictment alleges violations of § 1324(a)(2)(B)(ii). The government states that this subsection "makes it illegal for any person to commit [any of the acts prohibited by § 1324(a)(1)(A)(i)–(v)] for commercial advantage or private financial gain." Dkt. 55. This is incorrect, as subsection (a)(2)(B)(ii) refers to punishments for violations of § 1324(a)(2), rather than violations of § 1324(a)(1)—the subsection at issue in this case. The statute makes clear that violations of § 1324(a)(1)(A) "shall be punished as provided in subparagraph (B)," that is, § 1324(a)(1)(B). Therefore, the appropriate subsection regarding commercial advantage or private financial gain in this case is § 1324(a)(1)(B)(i), which states:

> A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs . . . in the case of a violation of subparagraph (A)(ii), (ii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under Title 18, imprisoned not more than 10 years, or both; . . . .

Ovalle has not asserted any arguments to the court regarding this issue. Further, this apparent mix-up appears immaterial at this time: although citing the wrong section misleads the defendant regarding the sentence he might face if convicted, Ovalle is on notice that the government is charging him with acting for "commercial advantage or private financial gain." The government, however, should take note of this before filing a superseding indictment.

misleading. Although the section contains "harboring" in its title, that word is also a term of art describing a particular crime within the section that is not alleged here.

In their briefs and at oral arguments the parties referred to the standard required to prove the crime of "harboring." For example, in his memorandum in support of the motion to dismiss, Ovalle cites case law requiring the government to prove he engaged in "conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence." Dkt. 140, p. 27–28 (citing *United States v. Ozcelik*, 527 F.3d 88, 97-101 (3rd Cir. 2008) (adopting the Second Circuit's standard for violations of "harboring" under § 1324(a)(1)(A)(iii))). The government's response cites the same two-prong standard for "harboring." Dkt. 150, p. 4 (citing *United States v. Kim*, 193 F. 3d 567 (2nd Cir. 1999) (establishing the "harboring" standard later adopted by the Third Circuit in *Ozcelik*)). This standard only applies to violations of § 1324(a)(1)(A)(iii), and is inapplicable in the case at hand, where the government alleges violations of § 1324(a)(1)(A)(iv).

Having established that the government has not alleged violations of the prohibition on "harboring" under § 1324(a)(1)(A)(iii), the court does not address the standard for that crime. Rather, the court addresses the crime at hand "encouraging or inducing" under § 1324(a)(1)(A)(iv).

*B. "Encouraging" an Undocumented Person to Reside in the United States*

The parties' arguments regarding the crimes involving the encouraging of undocumented persons to reside in the U.S. can be divided into two categories. First, the parties disagree over the scope of activities the word "encouraging" encompasses.

Second, the parties disagree over whether Ovalle's conduct, as alleged by the government, fits into that scope. The court addresses these issues in that order.

Section § 1324(a)(1)(A)(iv) states in full:

"Any person who encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law . . . shall be punished as provided in subparagraph (B)."

As Ovalle points out, Congress has not defined "encourages" within the statute, and its meaning is ambiguous. Ovalle asserts that the government equates encouraging to mere employment, an interpretation that no court has adopted. Using statutory construction and referring to non-binding authority from other courts, Ovalle urges the court to adopt a high standard requiring "but-for" causation, i.e. but-for the defendant's encouragement, the undocumented person likely would not have remained in the United States. In a response citing no relevant authority, the government cites the standard for "harboring"—which, as discussed above, does not apply here—and then begs the question by asserting that whatever the standard might be, the defendants' conduct certainly violated it. The first step for the court, then, is to determine the proper standard to apply in this case. As the United States Court of Appeals for the Tenth Circuit, has not yet addressed the issue, the court looks to other circuits for discussion.

In setting its standard, the Third Circuit cited to Black's Law Dictionary for the definition of "encourage": " '[t]o instigate; to incite to action; to give courage to; to inspirit; to embolden; to raise confidence; to make confident.' " *DelRio-Mocci v. Connolly Prop's., Inc.*, 672 F.3d 241, 248 (3d Cir. 2012) (citing to a source that quoted BLACK'S LAW

9

DICTIONARY 620 (4th ed. 1968). Because the phrase in the statue is "encourages or induces," the Third Circuit then considered the definition for "induce"—"to move by persuasion or influence; to call forth or bring about by influence or stimulation; to cause the formation of; or to produce." *Id.* (citing MERRIAM-WEBSTER ONLINE DICTIONARY, *available at* www.merriam-webster.com). From these definitions and the close proximity of the word "encourages" with the word "induces" in the statute, the court determined that "encourage" should be interpreted as "a catalyst or trigger that drives, motivates, or spurs another individual to embark on a course of action that he might not have otherwise," essentially adding a causation requirement to the statute. Additionally, the Third Circuit required that the encouragement or inducement must be "substantial," borrowing the word from the standard for the crime "harboring." *Id.* Under its interpretation, the Third Circuit found that the defendant—a business that allegedly sought out undocumented people to be tenants for its apartment complex—did not "substantially encourage or induce" for purposes of federal law. *Id*. at 249.

The Fourth Circuit interpreted the same language in *United States v. Oloyede*, 982 F.2d 133, 137 (4th Cir. 1992). In *Oloyede*, one defendant was accused of selling false employment and Social Security documents to illegal aliens and referring them to the second defendant, an immigration attorney who helped them prepare their INS applications with those false documents. 982 F.2d at 135. In its analysis of the statute's legislative history, the Fourth Circuit noted that the current statute was part of the Immigration Reform and Control Act of 1986 (IRCA), which replaced its predecessor—the Immigration and Nationality Act of 1952—to " 'control illegal immigration to the

10

U.S., make limited changes in the system for legal immigration, and provide a controlled legalization program for certain undocumented aliens who have entered this country prior to 1982.' " *Id*. at 137 (citing H.R. Rep. No. 99-682(I), 99th Cong. 2nd Sess., U.S. Code Cong. & Admin. News 1986, 5649). Regarding illegal workers, the House Report cited by the court stated:

> Employers will be deterred by the penalties in this legislation from hiring unauthorized aliens and this, in turn, will deter aliens from entering illegally or violating their status in search of employment.

*Id.* at 138 (citing H.R. Rep. No. 99-682(I) at 5650). The court stated that "by imposing severe sanctions on employers who hired illegal aliens . . . . [t]he net effect of IRCA was to put illegal aliens to a serious choice of either obtaining legal status or leaving this country." *Id*. Interpreting the statute, the court stated " 'encouraging' relates to actions taken to convince the illegal alien to come to this country or to stay in this country." *Id.* at 137. The court specified that the defendants' "actions reassured their clients that they could continue to work in the United States, that they would not be subject to the threat of imminent detection and deportation, and that they could travel back to their homeland without risk of being prevented from returning, thus providing all of the benefits of citizenship." *Id.* at 137. Applying its interpretation to the facts before it, the court found the defendants' actions "to be exactly the type of encouragement the statute was aimed at preventing . . . ." *Id.* at 138.

If a standard requiring causation is viewed as one end of the spectrum, the Seventh and Eleventh Circuits' interpretation might be seen as the other end. Employing their own straightforward reading of the statute, these courts equated

11

"encourage" with "help." In *United Sates v. Fujii*, 301 F.3d 535, 537–38 (7th Cir. 2002), the defendant had tried to help three Chinese nationals in getting through U.S. Immigration by providing them with fraudulent passports. Without subjecting the statute to a rigorous analysis, the court declared that "[t]o prove that Fujii 'encouraged or induced' the aliens, all that the government needed to establish was that Fujii knowingly helped or advised the aliens." *Id.* at 540 (internal citation omitted). Under this standard, the court held that the government had produced sufficient evidence to convict the defendant. *Id.*

The Eleventh Circuit also interprets "encourage" to mean "help." In *United States v. Lopez*, 590 F.3d 1238, 1243 (11th Cir. 2009), the U.S. Coast Guard intercepted Lopez's boat while he was driving it from the Bahamas towards Miami, with seventeen undocumented people in the boat's forward cabin. Like Ovalle in the case before this court, the defendant argued that interpreting "encourage" broadly would render the other subsections of § 1324 superfluous. *Id*. at 1250.

> Subsection 1324(a)(1)(A)(i) criminalizes more than the mere act of bringing an alien to the United States because it also requires that the alien be brought to a place other than a port of entry, which is different conduct than what is covered by § 1324(a)(1)(A)(iv). And § 1324(a)(1)(A)(i) applies to aliens with prior official authorization to enter, whereas § 1324(a)(1)(A)(iv) applies to aliens whose entry is illegal. . . . In turn, § 1324(a)(1)(A)(v)(II) criminalizes aiding or abetting the commission of any of the preceding acts in subsection 1324(a)(1)(A), including both 1324(a)(1)(A)(i) and 1324(a)(1)(A)(iv). Subsection 1324(a)(1)(A)(v)(II) cannot be superfluous on its own without reference to the underlying subsections, and since subsection 1324(a)(1)(A)(i) is not rendered superfluous by the district court's interpretation of subsection 1324(a)(1)(A)(iv), neither is subsection 1324(a)(1)(A)(v)(II).

*Id.* The court noted that the defendant "was more than just a passive boat driver," as the evidence showed he had earned $20,000 for a previous smuggling trip, lied to Coast Guard officers when he was initially stopped, lied about the undocumented people's residency documentation, and pretended the only undocumented persons on board were those up on deck. *Id.* at 1252. Applying its standard, the court upheld the Lopez's conviction. *Id.*

The court in *Lopez* cited one of its previous decisions, *United States v. Ndiaye*, 434 F.3d 1270, 1278 (11th Cir. 2006), where the defendant had made other arguments similar to the one before this court. In *Ndiaye*, the court affirmed the defendant's conviction under § 1324(a)(1)(A)(iv) for "assisting over seventy Indonesian aliens in securing Social Security numbers." *Id.* The defendant argued that his actions did not violate the statute because "[a] Social Security card did not change anyone's status, and there was no evidence that anyone was 'induced' to live here by obtaining such a card." *Id.* at 1296. The court affirmed the defendant's conviction because "[a] jury could find that [the defendant]'s assistance in helping [an undocumented person] obtain a Social Security card, which the evidence established he is not entitled to have, encouraged or induced him to reside in this country in violation of the statute." *Id*. at 1298. This was because the undocumented person "was able to work in the United States because of the Social Security number he was issued." *Id.*

In *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1284 (11th Cir. 2010), a restaurant franchisee was accused of knowingly providing undocumented workers with fraudulent names and Social Security numbers in order to unlawfully employ them.

13

Like Ovalle, the defendant in *Edwards* argued that the complaint "alleged only that the defendants knowingly encouraged or induced illegal aliens to work in the United States instead of encouraging or inducing them to 'reside' here." *Id.* at 1296. According to the defendant, the prospect of working at the defendant's restaurant did not "provide any realistic incentive for staying in this country." *Id.* The court characterized the argument as "border[ing] on the frivolous." *Id.* Undocumented persons' "ability to find and keep jobs depends to a considerable extent on improperly obtaining the necessary documentation." *Id.*

As a final note, despite the Eleventh Circuit's seemingly broad interpretation of the statute, the court has clarified that "encouragement" requires more than "mere employment."[6]

This court declines, on one hand, to interpret a causation requirement into the statute, as the Third and Fourth Circuits appear to have done. Although the word "induce" implies that the defendant's actions must have caused the undocumented person to take a certain act, the word "or" in the phrase "encourages *or* induces" distinguishes the first word from the second. Any interpretation of the word "encourage" should not render the word "induce" superfluous. On the other hand, the court finds the equating of "encourage" with "help"—as the Seventh and Eleventh Circuits have done—troubling as well. This interpretation could potentially result in the prosecution of soup kitchen managers, low-income shelters, and immigration attorneys

---

[6]*United States v. Khanani*, 502 F.3d 1281, 1289 (11th Cir. 2007). The U.S. Court of Appeals for the Eleventh Circuit found no error in the district court's failure "to instruct the jury that the employment of illegal aliens in and of itself did not constitute a § 1324(a) offense because the instructions as given required the United States to prove a level of knowledge and intent beyond the mere employment of illegal aliens." *Id.*

14

giving advice to undocumented residents about their options to remain in the United States and pursue citizenship.

Given the facts before it, the court must formulate a standard for interpreting the word "encourage" in this case. The court agrees with the Eleventh Circuit that employment of undocumented individuals is not sufficient by itself to be encouragement. However, employment that is coupled with aggravating factors consistent with knowingly assisting such persons in maintaining illegal residence qualifies as illegal encouragement under § 1324(a)(1)(A)(iv).

The court now applies this standard to the facts alleged by the government. According to the government, Ovalle was a framing crew leader who managed a team of undocumented workers for Advantage. These workers used fake names and were apparently given false identification documents, facts the government alleges were known to management of Advantage, which shuffled out unlawful employees when the government learned of them. The government also alleges that Advantage intentionally failed to fill out and submit employment forms for several of its undocumented workers. Ovalle cashed checks written to him by Advantage, and he distributed the money to his crew. According to the indictment, these workers, including Ovalle, were told that if OSHA investigators conducted any inspections, they were to lie and tell the investigators that they worked for a subcontractor. The undocumented workers also allegedly ran drills for running and hiding from immigration officials.

These facts clearly suggest the defendant was part of a scheme that IRCA was passed to address. *See Oloyede*, 982 F.2d at 138 (citing H.R. Rep. No. 99-682(I), 99th Cong. 2nd Sess., U.S. Code Cong. & Admin. News 1986, 5649–50). Advantage's failure to document its workers and awareness of their false identification documents is equivalent to if Advantage had itself provided them with false identification documents. According to the indictment, the defendants knew of these workers' illegal status and decided to take advantage of it, knowing that giving these undocumented workers would encourage them to remain residents of the United States.

The court holds that the facts alleged in the indictment, if proved at trial, are sufficient for a jury to find that Ovalle knowingly "encouraged"—and conspired to "encourage"—undocumented persons to reside in the United States under this standard. Therefore, the court denies Ovalle's motion to the extent it sought dismissal of counts one through twelve.

*C. Money Laundering Charges*

Counts thirteen, twenty-eight and twenty-nine allege that Ovalle laundered money and conspired to launder money under 18 U.S.C. § 1956(a)(1)(B)(i).

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

§ 1956(a)(1)(B)(i). The statute clarifies:

> For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

*Id.* Further, the statute defines "proceeds": "the term 'proceeds' means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." § 1956(c)(9).

In this case, the government contends that by hiring undocumented workers, Advantage made over $4.6 million, and Ovalle personally cashed more than $400,000 in checks from Advantage. It argues that Ovalle's money came from "encouraging" undocumented persons to reside in the United States. But this is not what the indictment alleges. As Ovalle argues, the money paid to Ovalle was not proceeds of his "encouraging"; rather, the money was proceeds of house sales by Advantage—a perfectly legal activity. Although it may be true that the houses were built with the help of undocumented workers, the government does not allege that Ovalle was compensated for recruiting workers or for giving them access to false employment documents. These are prerequisites for the government to claim the money paid to Ovalle was proceeds for "encouraging" the undocumented workers.

The government alleges only that Advantage made money from selling houses and paid Ovalle from this money. Section 1956(a)(1)(B)(i) requires the money to be "proceeds of specified unlawful activity," and § 1956(c)(9) requires the proceeds to be obtained through unlawful activity. Building and selling houses is not an unlawful activity, and the government cites no authority for the proposition that the sale of a

17

house turns into a money laundering venture if it was constructed with the help of persons not lawfully present in the United States.

The court holds that the money earned by Advantage for selling houses and the money earned by Ovalle for building houses cannot be construed as proceeds of illegal activity. Accordingly, the court dismisses counts thirteen, twenty-eight, and twenty-nine, as they do not allege any crime.

IT IS THEREFORE ORDERED this 30th day of December, 2013, that Delgado-Ovalle's Motion to Dismiss Indictment (Dkt. 139) is granted in part and denied in part to the extent set forth above.

s/J. Thomas Marten
J. THOMAS MARTEN, JUDGE
